UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

HENRY WEBER                                    CIVIL ACTION

VERSUS                                         NO. 06-1055

N. BURL CAIN, WARDEN                           SECTION "C"

## ORDER AND REASONS

Before the Court is a petition for habeas corpus by Henry Weber ("Petitioner"), filed

pursuant to 28 U.S.C. § 2254. Petitioner is seeking relief from his November 15, 2000 conviction

for second degree murder under LA. REV. STAT. § 14:30.1, for which he was sentenced to life in

prison without the benefit of parole.  Petitioner is currently incarcerated at the Louisiana State

Penitentiary in Angola, Louisiana.  As grounds for relief, Petitioner claims: (1) the trial record is

incomplete and unreliable in violation of his Fourteenth Amendment rights; (2) there was

insufficient evidence to support the conviction and sentence; (3) the prosecutor's improper

reference during the opening statement, and the trial judge's response, violated his due process

rights; (4) he received ineffective assistance of counsel because of his attorney's failure to

impeach an eye-witness, Roy Brumfield, as well as the failure to object to the trial judge's

improper remarks during the state's opening statement; (5) the trial court erred when it denied a

motion for a new trial based on newly discovered evidence; (6) the trial court erred by permitting

1

hearsay testimony regarding unidentified witnesses; (7) there is new evidence, in the form of an

affidavit, which merits a new trial; (8) the trial court erroneously instructed the jury on the

charges of reasonable doubt and circumstantial evidence; (9) the state failed to prove that his

statements were knowing and voluntarily provided; (10) the trial court improperly denied a

motion to suppress the photographic lineup; (11) the trial court improperly precluded

impeachment of a witness regarding prior heroin use; (12) the trial court improperly prohibited

the defense from presenting evidence that the police planted and/or tampered with evidence.[1]

For the reasons set forth below, this petition is **DENIED WITH PREJUDICE**.


I. CASE HISTORY

Petitioner was indicted on August 24, 2000 for second degree murder in violation of LA.

REV. STAT. § 14:30.1. Fed. Rec., Petition for *Habeas Corpus*, p. 2. Petitioner moved to

suppress evidence, identification, and a confession; the motion was heard and denied on

September 15, 2000. *Id.* The state filed two (2) motions in limine, one to preclude allegations of

evidence tampering, the other to preclude questions pertaining to witnesses' acts for which they

had not been convicted. The trial court granted both motions. Following a trial on November

15, 2000, Petitioner was convicted as charged. State Rec. Vol. 1, Minute Entry, p. 19. On

November 29, 2000, the trial court denied Petitioner's motion for a new trial and sentenced him

to life in prison without the benefit of parole or probation. State Rec. Vol. 2, Sentencing

Transcript, p. 2. Then, on November 14, 2001, Petitioner filed a supplemental motion for a new

---

[1] The order in which the claims are listed and analyzed in this opinion differs from the order in which they were presented in Petitioner's submission for organizational purposes. In addition, Petitioner presented claims nine through twelve in his Motion to Supplement Petition for Writ of Habeas Corpus.

trial, which was denied by the trial court on December 18, 2001.  State Rec. Vol. 2, Transcript of

Hearing on the Motion for a New Trial.  The Louisiana Court of Appeal for the Fourth Circuit

summarized the facts of the case during Petitioner's direct appeal as follows:

> Roy Brumfield, who was twenty-six at the time of trial, testified that he and Jim Walker had been friends for most of their lives and that Walker was like a family member. Shortly before the murder, Brumfield, the victim and two other individuals entered an abandoned building in the Florida Housing Project to consume heroin. The victim snorted heroin while Brumfield and the others took it intravenously. Brumfield related that after the victim had finished snorting the heroin he stepped outside and that he followed him. When Brumfield exited, the victim was sitting on his bicycle. Brumfield heard shots ring out and witnessed Walker fall to the ground. He stated that Walker struggled to push the bicycle from him but was unable to do so. Brumfield observed two subjects in the courtyard and identified the defendant as the shooter. Brumfield was standing by some bushes as he watched Henry Weber continuing to fire a gun as he drew closer to the victim until he stood over him. At the time, Brumfield believed that as many as ten shots may have been fired. He also testified that he was not sure how many shots were fired.

> When the shooting stopped Brumfield ran. He returned to the scene as the police were arriving and observed the motionless body of Jim Walker and grabbed him. The officers pushed him away. Brumfield was taken to the police station and questioned but he did not identify Henry Weber as the perpetrator. Brumfield was asked to identify the defendant, who was at the station, and although he acknowledged that he knew him he did not identify him as the perpetrator. Brumfield explained that identifying Weber was not an option for him at that time. His testimony was essentially that where he lived people take care of things themselves, whether one describes it as an eye for an eye or payback, and that he planned to do so.

> An officer was asked to drive Brumfield home, but Brumfield requested to be taken to Charity Hospital where he admitted himself for substance abuse treatment. While at Charity, Brumfield met with Jane Walker and told her what he had seen when her brother was murdered. After he was discharged, Brumfield called the Fifth District station and subsequently met with Detective Polito. He gave a taped statement and identified Henry Weber as the perpetrator. He also identified Weber from a photographic lineup.

> Officer Leflore James Young Sr. and his partner Officer Benja Johnson were dispatched to the scene of the shooting at the intersection of Gallier and Florida. When they arrived, two other officers were already there. Young observed the victim lying on the ground with apparent gunshot wounds. He also observed a

bike, a shirt, a hat and some blood on the sidewalk. Young notified EMS and secured the crime scene. Young began looking for evidence that would be left from a gun and marked the location of six .45 caliber shell casings which were discovered in the courtyard.

In the course of his investigation, Officer Young spoke with three witnesses who identified a suspect named Henry who lived on Dorgenois Street. The officer was able to determine that Henry Weber was the individual to whom the witnesses were likely referring.

Subsequently, Officer Young and his partner relocated to the crime scene to see if they might have overlooked any evidence as there was a question as to how many times the victim had been shot. As the officers approached, they observed a subject bent over in the bushes at the location of the shooting looking for something. As they neared, the subject looked directly at the car and then ran. Officer Johnson recognized him as the suspect Henry. The officers observed the defendant enter the abandoned building at the location. Officer Johnson went around to the front while Officer Young entered the rear. Young heard a noise coming from upstairs and went to investigate. On the third floor he observed the same subject who they were pursuing standing with something in his hand. He ordered the defendant to drop the object. After handcuffing and patting the defendant down for weapons, Officer Young retrieved the object and found it be a sock containing a box of .45 caliber bullets. Officer Young advised the defendant of his rights and informed him that he was being held in connection with the recent murder. A crime scene technician was summoned to retrieve the evidence and the defendant was transported to the police station.

Jane Walker, the victim's sister, testified that she received a call on the night of the shooting informing her that her brother had just been shot. She ran to the scene and saw her brother lying motionless on the ground. While on the scene, she spoke with a police officer and she also saw Brumfield in a police car. He motioned for her to speak with him but the car drove off before they could talk. Two or three days later, Walker met with Brumfield at Charity hospital. Subsequently, she met with Detective Polito at the Fifth District station and identified Henry Weber from a photographic lineup.

Detective Frank Polito, a member of the Fifth District homicide Division, testified that when he arrived at the scene of the shooting the victim had already been removed by EMS. Detective Polito spoke with Roy Brumfield and although the detective did not develop any initial suspects after speaking with him, he had him transported to the Fifth District station because he was convinced that Brumfield knew more about the shooting than he was saying. The detective identified a number of photographs and diagrams of the crime scene depicting the area and the evidence that was recovered.

Once at the station Brumfield related that he had been in an abandoned building doing drugs with two other individuals, and he had walked down stairs and was at the doorway when he witnessed the shooting. Detective Polito testified that Brumfield was reluctant to provide any information as to the identity of the shooter.

Polito related that after the defendant was brought in, he brought Brumfield to make an identification. Brumfield knew that it was Henry Weber but did not say that he was the one who shot Jim Walker. Polito related that Brumfield was shaking when he looked at Weber through the two-way mirror. Four or five days after the occurrence, Detective Polito was contacted by Jane Walker. He took a taped statement from her and then had her view a photographic lineup of Henry Weber. Subsequently, Roy Brumfield contacted the [sic] Detective Polito. Polito took a taped statement from Brumfield and showed him a photographic lineup. Brumfield identified Henry Weber. Subsequently, Polito obtained an arrest warrant for the defendant. Detective Polito also obtained a search warrant for Webers residence. Weber was arrested at his home, and a search of the location did not result in any evidence being recovered.

Kenneth Leary testified as an expert in ballistics and firearms identification. He tested the six bullet casings recovered at the scene and determined that they were from .45-caliber ammunition and that they were all fired from the same weapon. Leary also tested a pellet submitted into evidence in the case and determined that it was from .45 caliber ammunition.

Officer Karl Palmer, a crime scene technician, testified that he processed the crime scene. He photographed the specific evidence and the overall scene, and he completed a diagram of the scene identifying the location of all the evidence that was collected. Officer Palmer also processed the scene in the abandoned building where the box of bullets was recovered.

Dr. William Newman testified as an expert in pathology and as an expert in the examination and procedures of an autopsy. Dr. Newman performed the autopsy of Jim Walker. He related that Walker suffered from six gunshot wounds. Identifying each by letter, he related that wound "A" struck the victim from the rear between his fourth and fifth ribs. The bullet traveled at a slightly upward angle through the lung and then exited the chest. Wound "B" entered the chest from the front and exited by the spine at a downward angle. The bullet caused extensive damage to the heart. Wound "C" entered the left buttock, traveled in an upward angle and entered the abdomen causing extensive damage to the colon. Wound "D" was a superficial wound through the upper thigh. It traveled at a slightly upward angle. Wound "E" was a superficial wound to the triceps, and wound "F" was located in the victim's upper arm or shoulder. In all, only wound "B" was from the front and at a downward angle. A blood test reflected marijuana and heroin use.

5

*State v. Weber*, 834 So.2d 540, 544-46 (La.App 4 Cir. 2002).

The Louisiana Fourth Circuit Court of Appeal affirmed Petitioner's conviction and sentence on December 4, 2002. *Id.* at 555. The Louisiana Supreme Court denied Petitioner's Application for Writ of Certiorari and/or Review on June 27, 2003. *State v. Weber*, 847 So.2d 1255 (La. 2003).

Subsequent to his direct appeal, Petitioner filed an application for post-conviction relief on January 26, 2004. State Rec. Vol. 1 Supplemental, Application for Post Conviction Relief. Post-conviction relief was denied by the trial court on June 18, 2004. State Rec., Vol. 1 Supplemental, Order of the Criminal District Court of the Parish of Orleans, Section C. On September 13, 2004, the Louisiana Appellate Court granted Petitioner's writ for Post-Conviction Relief, but denied relief. State Rec. Vol. 3, Order of the Fourth Circuit Court of Appeal, Case No. 2004-K-1245. The Louisiana Supreme Court denied Petitioner's Application for Supervisory and/or Remedial Writs regarding his application for post-conviction relief on November 28, 2005. *State ex rel. Weber v. State*, 916 So.2d 131 (La. 2005). Petitioner filed the instant *habeas* petition on January 27, 2006.[2]

## II. PROCEDURAL REVIEW

### A. Custody Requirement

A petitioner must be "in custody" for a federal court to entertain a petition for habeas relief. 28 U.S.C. § 2241(c); 28 U.S.C.§ 2254(a). Physical incarceration satisfies the custody

---

[2] A *pro se* petitioner files his or her petition for prescriptive purposes on the date that it is signed. *See Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995); *see also United States v. O'Kaine*, 971 F. Supp. 1479, 1480 (S.D. Ga. 1997) (inferring that the signature date on the movant's 28 U.S.C.§ 2255 motion to vacate was the date the movant deposited the motion with prison officials for forwarding to the court).

requirement. *See e.g., Maleng v. Cook*, 490 U.S. 488, 491 (1989).  Here, Petitioner is

incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.  Fed. Rec. Petition for

Habeas Corpus, p. 1.  Thus, Petitioner is in custody for the conviction he is attacking.

Accordingly, one basis of this Court's subject matter jurisdiction over Petitioner's claim for

relief is satisfied.

### B. Venue

Under 28 U.S.C.A. § 2241(d), venue lies in the district in which the Petitioner is

incarcerated or the district from which his conviction or sentence was obtained.  Petitioner is

incarcerated at the Louisiana State Penitentiary in Angola, Louisiana, which is in West Feliciana

Parish, a parish that falls within the Middle District of Louisiana according to 28 U.S.C. § 98(b).

However, Petitioner was convicted and sentenced in Orleans Parish, which, under 28 U.S.C. §

98(a), falls within the Eastern District of Louisiana.  Therefore, venue lies for this petition under

28 U.S.C.A § 2241(d).

### C. Timeliness

The State concedes that Petitioner timely filed his *habeas corpus* petition; upon review,

this Court agrees that the petition is timely.  Fed. Rec., Response to *Habeas Corpus* Petition, p.

4.  The Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires that a

*habeas* petitioner bring his or her 28 U.S.C.§ 2254 action within one year of the date on which

his or her conviction or sentence becomes "final."[3]  Yet, AEDPA's one-year statute of

_____

[3] 28 U.S.C.§ 2254(d) provides:
   (1) A 1-year period of limitation shall apply to an application for a writ of habeas
   corpus by a person in custody pursuant to the judgment of a State court.  The
   limitation period shall run from the latest of –
         (A) the date on which the judgment became final by the conclusion of direct
         review or the expiration of the time for seeking such review;
         (B) the date on which the impediment to filing an application created by State

limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court.  28 U.S.C.§ 2254(d)(2); *Fields v. Johnson*, 159 F.3d 914 (5th Cir. 1998). Furthermore, "a properly filed application is one submitted according to the state's procedural requirements, such as the rules governing notice and the time and place of filing." *Villegas v. Johnson*, 184 F.3d 467, 469 (5th Cir. 1999) (quoting *Lovasz v. Vaughn*, 134 F.3d 146, 148 (3rd Cir. 1998)) (internal quotations omitted); *Williams v. Cain*, 217 F.3d 303 (5th Cir. 2000).

The Supreme Court ruled that  "finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003); *see also, Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003).  Additionally, a petitioner has ninety days to file a writ of certiorari in the United States Supreme Court after a decision has been rendered by the state's highest court.  Sᴜᴘ. Cᴛ. R. 13(1).  As noted above, the Louisiana Supreme Court denied Petitioner's direct appeal on June 27, 2003.  *State v. Weber*, 847 So.2d 1255 (La. 2003). Petitioner did not appeal to the United States Supreme Court.  Therefore, Petitioner's conviction became "final" on September 25, 2003, ninety days after the Louisiana Supreme Court's decision.

---

> action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

In this case, AEDPA's one-year statute of limitations was tolled when Petitioner filed his application for post-conviction relief on January 26, 2004.  State Rec. Vol. 1 Supplemental, Application for Post Conviction Relief.  AEDPA's statute of limitations remained tolled for the duration of time in which Petitioner's post-conviction relief application was pending in the state judicial system.  Petitioner's post-conviction relief application was denied by the Louisiana Supreme Court on November 28, 2005.  *State ex rel. Weber v. State*, 916 So.2d 131 (La. 2005). Because Petitioner filed the petition *sub judice* on January 27, 2006, the petition is timely because less than 365 days elapsed from the date that the state conviction became "final," excepting the time during which Petitioner's properly filed application for post-conviction relief was pending in the state courts.[4]

---

[4] Here, a total of 123 days passed from September 25, 2003, when the Louisiana Supreme Court's decision to affirm Petitioner's conviction became "final," until January 26, 2004, when Petitioner filed his state motion for post-conviction relief.  AEDPA's statute of limitations was then tolled while Petitioner's claims for post-conviction relief were pending in state court.  Thus, AEDPA's one-year limitations period remained tolled from January 26, 2004 until November 28, 2005 when the Louisiana Supreme Court denied Petitioner's Application for Supervisory Writs regarding his claim for post-conviction relief.  Adding the additional fifty-nine (59) days between the time that the Louisiana Supreme Court denied Petitioner's post-conviction application for relief (November 28, 2005) and the time Petitioner filed his habeas petition with this Court (January 27, 2006) to the 123 days that had previously elapsed under AEDPA's limitations period, shows that Petitioner filed his habeas petition 182 days after his conviction became "final."  Accordingly, his petition is timely under AEDPA's one-year statute of limitations.

The Court notes that the petition was stamped for filing by the Clerk of the Eastern District of Louisiana for filing on April 10, 2006.  Even using this later date does not make the petition untimely.  133 days passed between November 28, 2005 and April 10, 2006; thus, adding 133 with 123 results in a total of 256 untolled days passing in between the time that Petitioner's case was "finalized" on direct review and the filing of his petition in federal court. Again, 256 is less than the 365 untolled days allowed pursuant to the AEDPA.

### D. Exhaustion

Generally, exhaustion of adequate state remedies is a "condition precedent to the invocation of federal judicial relief under [28 U.S.C.§ 2254]."  *Preiser v. Rodriquez*, 411 U.S. 475, 489 (1973).  The entirety of the factual allegations and legal theories presented to the federal court must have been presented in a procedurally proper manner to the highest state court, here the Louisiana Supreme Court.  *See e.g., Anderson v. Harless*, 459 U.S. 4, 6 (1982) (holding a "habeas petitioner must have fairly presented to the state courts the substance of his federal habeas corpus claim) (internal quotations omitted) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971)); *Yohey v. Collins*, 985 F.2d 222, 226 (5th Cir. 1993); *Rose v. Lundry*, 455 U.S. 509 (1982).  It is important to note that the issues in a *habeas* petition could have been presented to the highest state court on direct appeal, or in a state post-conviction proceeding; either is sufficient and both are not required.  *Brown v. Allen*, 344 U.S. 443, 447 (1953); *Myers v. Collins*, 919 F.2d 1074, 1075-77 (5th Cir. 1990).

The exhaustion requirement is now codified by AEDPA, which provides, *inter alia*, that habeas relief "shall not be granted unless it appears that . . . (A) the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C.§ 2254(b)(1).  Yet, the United States Fifth Circuit Court of Appeals has noted, 28 U.S.C. § 2254(b)(2) "allows a federal court, in its discretion, to **deny** habeas relief on the merits, regardless of whether the applicant has exhausted state remedies" and whether exhaustion is waived by the state, to further the interests of judicial economy.  *Jones v. Jones*, 163 F.3d 285, 299 (5th Cir. 1998) (emphasis in original).

Here, although the State failed to address exhaustion in their response to the *habeas* petition, the Court finds that Petitioner's claims are exhausted as required by the AEDPA.  In this matter, Petitioner presents eight (8) distinct claims for relief in his federal *habeas* petition;

and, four (4) supplemental claims for relief.  Each of these claims was presented to the Louisiana Supreme Court either on direct appeal, or in Petitioner's briefs for post-conviction relief.[5] Accordingly, petitioner has satisfied the AEDPA's exhaustion requirement pursuant to *Myers v. Collins*.

## II. STANDARD OF REVIEW

AEDPA revised 28 U.S.C.§ 2254(d)(1) and (2), furnishing new standards of review for questions of fact, questions of law, and mixed questions of law and fact for *habeas* petitions. The statute mandates that when a state court has adjudicated a claim on the merits, pure questions of law, as well as mixed questions of law and fact, are reviewed under 28 U.S.C. § 2254(d)(1).  *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).  But, questions of fact are reviewed under 28 U.S.C.§ 2254(d)(2).  *Id.*

Regarding questions of law, and mixed questions of law and fact, a federal court must defer to the state court's decision unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.§ 254(d)(1).  The United States Supreme Court has noted:

> § 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning.  A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one.

---

[5] State Rec. Vol. 1 Supplemental, Original Brief of Henry Francis Weber;  State Rec. Vol. 1 Supplemental, Application for Post-Conviction Relief.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (internal citations omitted).  Yet, a state court's factual findings are presumed to be correct and a federal court "will give deference to the state court's decision unless it was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  *Hill*, 210 F.3d at 485; 28 U.S.C.§ 2254(e)(1).

## IV. PETITIONER'S CLAIMS

### 1. Incomplete Trial Court Record

Petitioner's first claim is that the trial court record was incomplete and inaccurate, and that the inaudible portions of the transcript prevented adequate appellate review.  On direct appeal, the Louisiana Fourth Circuit Court noted that "[t]he Louisiana Constitution, article I, section 19 (1974), provides in pertinent part: 'No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based.'" *State v. Weber*, 834 So.2d 540, 547 (La.App. 4 Cir. 2002).  Additionally, the appellate court held:

> the trial transcript periodically notes that a statement was "inaudible." Review of the transcript reflects that only short phrases or statements or a series of words were "inaudible." The transcript as a whole is coherent and understandable. The overwhelming majority of the testimony of all witnesses was recorded, with no large omissions.

*Id.* at 547-48.

Due process requires that a record of "sufficient completeness" be provided for appellate review of the errors raised by a criminal defendant.  *Draper v. Washington*, 372 U.S. 487, 496-98 (1963).  Indeed, a petitioner must demonstrate that the missing portions of the record preclude effective appellate review of the issues to merit relief.  *Id.*  Upon this Court's review of the record, the Court observes the "inaudible" notations are relatively few and limited in scope.

Thus, the state court's determination that the record was sufficient for review was not an unreasonable determination of the facts in light of the evidence.  Pursuant to the AEDPA, this Court must defer to the state court's factual determination that the record was sufficient for appellate review purposes.  *Hill*, 210 F.3d at 485.  Accordingly, Petitioner's first claim for *habeas* relief is denied.

### 2. Insufficient Evidence to Convict

Petitioner next claims that there was insufficient evidence to convict him.  Fed. Rec., *Habeas* Petition, pp. 34-37.  Specifically, Petitioner argues that jury could not find beyond a reasonable doubt that the state's key witness, Roy Brumfield, had a clear view of the shooting because of Brumfield's inconsistent statements.  *Id.* at 34.

First, the Court notes that a claim of insufficient evidence presents a mixed question of law and fact.  *Taylor v. Day*, 1999 WL 195515, at *3 (E.D.La. Apr. 6, 1999), *aff'd*, 213 F.3d 639 (5th Cir. 2000).  The well established federal standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) requires the court to determine whether, after identifying the elements of the offense as defined by state substantive law and viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt.  *Donahue v. Cain*, 231 F.3d 1000, 1004 (5th Cir. 2000).

Petitioner was convicted of second degree murder under LA. REV. STAT. § 14:30.1. Under Louisiana law, "Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm." LA. REV. STAT. § 14:30.1. Furthermore, "[s]pecific intent is a state of mind and need not be proved as a fact." *State v. Woods*, 942 So.2d 658, 666 (La.App. 2 Cir. 2006).  Indeed, specific intent "may be inferred from

the circumstances of the transaction and the actions of the defendant." *Id*.  Finally, the state

substantive law notes that "[t]he determination of whether the requisite intent is present in a

criminal case is for the trier of fact." *Id.*

In his petition, Petitioner alleges that the jury could not have rationally excluded every

reasonable hypothesis of innocence based on Brumfield's testimony.  However, the fact that

Petitioner's conviction may have been based on the credibility of witness testimony is

insufficient to supplant the jury's determination of guilt.  *Green v. Johnson*, 160 F.3d 1029,

1047-48 (5th Cir. 1998).  A review of the sufficiency of the evidence does not include reviewing

the weight of the evidence or the credibility of the witnesses.  *Schlup v. Delo*, 513 U.S. 298, 330

(1995) (under *Jackson*, resolving credibility issues is generally beyond the scope of appellate

review); *United States v. Goff*, 155 Fed. Appx. 773 (5th Cir. 2005) (citing *United States v.*

*Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)).  Instead, the narrow standard of review under

*Jackson* "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the

testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

facts." *Jackson*, 443 U.S. at 319.  Indeed, "[t]he trier of fact has broad discretion to resolve

conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to

ultimate facts." *Green*, 160 F.3d at 1047 (quoting *Jackson*, 443 U.S. at 319) (internal quotations

omitted).

The Louisiana Court of Appeals for the 4th Circuit addressed this issue during Petitioner's

direct appeal:

> Defendant alleges that in light of the fact that Roy Brumfield did not identify the
> defendant as the perpetrator when he first viewed him, a rational jury should not
> have found the defendant guilty. Defendant adds that Brumfield's explanation for
> not immediately identifying the defendant was  that he was scared, is implausible
> as he testified that he had no problems with the defendant and considered him an

associate of sorts. Defendant misconstrues the record in this regard. Brumfield
testified that he did not immediately identify the defendant because he considered
acting on the victim's behalf himself. Brumfield never testified that he remained
silent out of fear. Brumfield did testify that he had nothing to gain by testifying
and that in fact he was likely in jeopardy for doing so. In any event, it is well
settled that credibility decisions by the jury should not be disturbed unless such
finding is clearly contrary to the evidence. *State v. Harris*, 624 So.2d 443, 447
(La.App. 4 Cir.1993). A reviewing court is not called upon to decide whether it
believes the witnesses or whether the conviction is contrary to the weight of the
evidence. *State v. Smith*, 600 So.2d 1319, 1324 (La.1992). The critical inquiry for
this court is whether, after viewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the elements of the crime
proven beyond a reasonable doubt. *Id.* Here the record evidence supports a
finding by this court that the jury did not abuse its discretion in finding the
defendant guilty.

Defendant further contends with respect to this assignment that inaudible
responses by Brumfield require reversal. Defendant states that from the record it
is impossible to tell where Brumfield was standing when he observed the
shooting, "whether he could see anything from inside the dark hallway where he
and Lorenzo were shooting heroin," and that it is impossible to tell whether it was
possible for Brumfield to actually see anything. The transcript clearly reflects that
Brumfield was standing by a bush, the location of which he identified from a
photograph, when he observed the shooting. Defendant further notes that
Brumfield testified at one point that he could see around the corner. Where the
defendant was standing and what he was able to see were clearly identified for the
jury by Brumfield through the use photographs and diagrams of the area.

Finally, defendant suggests that a jury could not have excluded every reasonable
hypothesis of innocence based on the testimony of Brumfield. The only such
hypothesis suggested by defendant was that there was another shooter. As
discussed with respect to assignment of error number one, the evidence failed to
suggest that there was more than one shooter. Furthermore, no evidence was
introduced to suggest that someone other than the defendant shot the victim. The
assignment of error lacks merit.

*State v. Weber*, 834 So.2d 540, 549-50 (La.App. 4 Cir. 2002).

This Court is not at liberty to weigh Brumfield's credibility.  However, the Court notes

that there was substantial circumstantial evidence in addition to Brumfield's testimony to

support a second degree murder conviction.  The Court notes that six .45 caliber shell casings

were recovered from the scene of the incident and Petitioner was apprehended shortly after the

incident in possession of a box of bullets with the same caliber.  Based on the evidence

presented, the jury found specific intent to kill or to inflict great bodily harm.  Viewing the

evidence in the light most favorable to the prosecution, a rational trier of fact could have found

the essential elements of the crime to have been proven beyond a reasonable doubt.

Accordingly, this Court cannot find that the decision reached by the state court to uphold

Petitioner's conviction was neither contrary to, nor an unreasonable application of federal law

under *Jackson*.  Consequently, this claim does not merit relief.

### 3. Improper Comments

Petitioner's third claim for relief is that the prosecutor and trial judge violated his due

process rights by alluding to his guilt in front of the jury.  Specifically, Petitioner notes that the

prosecutor stated that if he had a "perfect" case, Petitioner would have pleaded guilty.

Additionally, Petitioner argues that the trial judge's comments[6] during opening argument tainted

the integrity of the proceeding.  The state argues that the claim is procedurally barred from

review because there was no contemporaneous objection to the trial judges comments.  First, the

Court agrees with the state courts that "for whatever reason, the prosecutor simply chose to

downplay the strength of the State's case and in doing so noted that the defendant had pled not

guilty."  *Weber*, 834 So.2d at 552.  Additionally, this Court notes that the last state court to

review this claim held that the trial judge's comments could not be reviewed because of the

failure to contemporaneously object.  *Id.* at 552-53.

In this case, there is no procedural bar to review the prosecutor's comments, and

prosecutorial misconduct is cognizable in federal *habeas* cases.  The appropriate standard of

---

[6] During opening arguments, the trial judge stated, "We all know what the defendant did.  Come
on let's go." State Rec., Vol. 2, Trial Transcript, p. 4.

review is "the narrow one of due process, and not the broad exercise of supervisory power."

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated

when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Id.*; *Smith v. Phillips*,

455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged

prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  In

this matter, the prosecutor's decision to downplay the strength of his case cannot be the basis for

rendering the trial fundamentally unfair.  The prosecutor stated that because his case was less

than "perfect," Petitioner did not plead guilty.  Clearly, the jury already knew that Petitioner did

not plead guilty because a guilty plea obviates the need for a trial.  Thus, Petitioner's argument

that the prosecutor's statement improperly alluded to guilt is unconvincing.

 With regard to the trial judge's comment, a federal court will not "review a question of

federal law decided by a state court if the decision of that court rests on a state law ground that is

independent of the federal question and adequate to support the judgment."  *Coleman v.

Thompson*, 501 U.S. 722, 729 (1991); *Lott v. Hargett*, 80 F.3d 161, 165 (5th Cir. 1996).  For

purposes of *habeas* review, a state court's decision is not sufficiently adequate or independent if

it "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and ...

the adequacy and independence of any possible state law ground is not clear from the face of the

opinion."  *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983).  Additionally, federal court may

reach the merits of a claim when a habeas petitioner demonstrates cause for his failure to comply

with the state rule and prejudice resulting from the default or, alternatively, that a miscarriage of

justice will occur if he is not granted relief.  *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992);

*Miranda v. Leibach*, 394 F.3d 984 (7th Cir. 2005), *cert. denied*, 125 S.Ct. 2947 (U.S. 2005);

*Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999).

In this matter, the Louisiana appellate court disposed of this issue by citing the Louisiana Code of Criminal Procedure Article 841(A), which states that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."  Furthermore, the state court's decision is devoid of any reference that would indicate that the state court addressed Petitioner's claim on the merits or otherwise based its ruling on federal law.  Thus, this Court cannot address the claim unless the judge's comments constitute a gross miscarriage of justice.  Petitioner does not raise, and the record does not support, the notion that enforcing the procedural bar as to this claim would constitute a gross miscarriage of justice because the trial judge merely acknowledged that Petitioner did not plead guilty.  Accordingly, the Court cannot grant relief on this ground.

### 4. Ineffective Assistance of Counsel

Petitioner next claims that his attorney rendered ineffective assistance of counsel in violation of his constitutional rights.  Petitioner's first ineffective assistance claim is that his counsel should have impeached an eye-witness, Roy Brumfield ("Brumfield"), with a prior statement.  Specifically, Petitioner argues that his attorney should have used the prior statement to challenge Brumfield's testimony that he could not identify the person standing with Petitioner at the time of the shooting.  Petitioner avers that Brumfield stated that the other person was named "Antonio" in the prior statement, and that this inconsistency should have been made known to the jury.  Additionally, Petitioner argues that his lawyer was ineffective for failing to object to the trial judge's remarks during the opening statements.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate (1) counsel's performance was deficient *and* (2) that

18

the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687.  To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment.  *Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002).  In the Fifth Circuit, "[c]ounsel's performance is deficient if it falls below an objective standard of reasonableness."  *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998).  An analysis of an attorney's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. *Strickland*, 466 U.S. at 689. "[I]t is necessary to judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).  Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  *Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether the petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to trial counsel, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*  Indeed, the Fifth Circuit has adopted the *Strickland* test holding: "[d]eficient performance is prejudicial only upon a showing that but for counsel's errors, there is a reasonable probability that the ultimate result would have been different and that confidence in the reliability of the verdict is undermined." *Little*, 162 F. 3d at 860-61.  In making a determination as to whether prejudice occurred, courts must review the

19

record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.

It is important to note that petitioners bear the burden of proof when asserting a claim for ineffective assistance of counsel. Petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1993); *see also, Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. *Strickland*, 466 U.S. at 697. Furthermore, an ineffective assistance of counsel claim is a mixed question of law and fact. *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002), *cert. denied*, 538 U.S. 969 (2003). Therefore, this Court must defer to the state court on these claims unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.§ 2254(d)(1).

In light of the AEDPA's deferential standard of review, and the "prejudice" prong of *Strickland*, this Court cannot grant *habeas* relief. Even assuming that Petitioner's counsel had impeached Brumfield with the prior inconsistent statement, Petitioner cannot demonstrate that he was prejudiced by his counsel's omission. In the prior statement, Petitioner alleges that Brumfield identified the person with Petitioner at the time of the shooting as "Antonio," but at trial, Brumfield could not identify the other person he saw. Petitioner's assertion that impeaching the witness with this information would have changed the trial's outcome is unpersuasive. The Court finds that Petitioner has not overcome *Strickland's* "prejudice" standard for this claim.

20

Additionally, Petitioner has not demonstrated that he was prejudiced by the trial judge's comments during the opening statements. Again, the trial judge stated, "we all know what the defendant did," referring to the Petitioner's decision to plead not guilty. The jury already knew that Petitioner did not plead guilty because trial had commenced. Therefore, the judge's statement did not disclose unknown or improper information. Consequently, Petitioner's attorney was not ineffective for failing to object to the statement, and this Court cannot grant *habeas* relief on the claims of ineffective assistance of counsel.

### 5. Trial Court's Denial of Motion for New Trial

Petitioner next contends that the state trial court's denial of his motion for a new trial constituted an abuse of discretion. Petitioner argues that he was entitled to a new trial because of newly discovered evidence in the form of a new witness, Donzola Williams. Petitioner asserts that Williams' testimony could exculpate him because Williams testified at the hearing on the motion for a new trial that her brother, Antonio, confessed to her that he had killed the victim in this matter.[7]  The district attorney notes that the trial court did not find Williams to be particularly credible, and that the state appellate court held that Williams' testimony would not have exculpated Petitioner. Additionally, the state argues that Petitioner is asserting that the state courts misapplied state law, and thus, the claim is barred from federal *habeas* review.

First, the Court notes that Petitioner cites *State v. Hammons*, 597 So.2d 990 (La. 1992) for the Louisiana standard for a defendant to merit a new trial: "(1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have produced a different result." Fed. Rec. Petition for

---

[7] The Victim is alternatively identified as "Jim Walker" or "Jimmy 'Winkie' Walker."

Habeas Corpus, p. 43-44.  Second, the Court agrees with the state that it cannot review state court interpretations of state law on *habeas* review.

The Fifth Circuit recently reaffirmed its decision in *Dickerson v. Guste*, stating, "[w]e will not review a state court's interpretation of its own law in a federal habeas corpus proceeding."  *Haygood v. Quarterman*, 239 Fed.Appx. 39, 42 (5th Cir. 2007) (quoting *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir.1991)).  The court also stated that "the denial of a motion for new trial does not necessarily constitute a violation of a federal constitutional right."  *Id.*  Similar to this case, the petitioner in *Dickerson* argued that the state trial court's denial of his motion for new trial constituted an abuse of discretion and a denial of his due process rights.  The Fifth Circuit specifically refused to review the merits of Dickerson's claims, holding, "[w]e do not sit as a super state supreme court in [a habeas] proceeding to review errors under state law."  *Dickerson*, 932 F.2d at 1145 (internal quotations omitted).  The Fifth Circuit also held that Dickerson's claim "failed to show that the state court's denial of his motion for new trial constituted a violation of any constitutional right."  *Id.*  Because Petitioner's claim in this matter aligns with Dickerson's claim, this Court cannot grant *habeas* relief.  *See also Boyd v. Puckett*, 905 F.2d 895 896-97 (5th Cir. 1990) (holding district court erroneously granted habeas relief when new evidence concerned petitioner's guilt, not "constitutional infirmity" by state courts).  Stated another way, Petitioner claims that he is entitled to a new trial because there is new evidence relevant to his guilt for the underlying crime.  Again, this Court cannot grant habeas relief these grounds because "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus."  *Boyd*, 905 F.2d at 896 (quoting *Armstead v. Maggio*, 720 F.2d 894, 896 (5th Cir.1983)).

### 6. Hearsay Testimony

Next, Petitioner asserts that the state courts erred by allowing Officer Young to testify about statements made to him at the scene of the incident because the statements were inadmissible hearsay.  The Louisiana Appellate Court agreed with Petitioner on direct appeal that the challenged testimony was inadmissible hearsay; however, the state court ruled that the effect of the statements constituted harmless error under *Chapman v. California*, 386 U.S. 18 (1967).  *Weber*, 834 So.2d at 554.  Thus, this Court must determine whether the state court decision was contrary to, or an unreasonable application of, clearly established federal law.

In *Brecht v. Abrahamson*, the United States Supreme Court discussed the harmless error standard as it applies to *habeas corpus* relief. 507 U.S. 619, 622 (1993).  The Court determined that the *Kotteakos* standard, instead of the criteria announced in *Chapman v. California*, applied to *habeas* review. *Id.* at 637.  The *Brecht* court determined the test to be whether "the error had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 637 (internal quotations omitted).

In *Cupit v. Whitley*, the Fifth Circuit described the test a reviewing court should apply to determine whether the erroneous admission of evidence at trial was harmless.  28 F.3d 532, 539 (5th Cir.1994).  These factors are: "(1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony; and (4) the overall strength of the prosecution's case against the defendant."  *Id.*  The *Cupit* court noted that the strength of the prosecution's case was "the single most important factor in determining whether the error was harmless."  *Id.*

In this matter, the State's case rested primarily on the testimony of an eyewitness, Roy Brumfield.  Clearly, Officer Young's testimony that three witnesses identified a male named

23

Henry as the perpetrator bolstered the state's case.  However, the state's case also included

a

Henry as the perpetrator bolstered the state's case.  However, the state's case also included evidence that Petitioner was apprehended at the scene of the crime shortly after the incident and possessed of a box of bullets of the same caliber as the murder weapon at the time of his arrest. Furthermore, Brumfield's account of the shooting, that the victim went down upon the first shot and did not rise again, was corroborated by the autopsy, which stated that all but one bullet entered the victim's body at an upward angle.  Additionally, there was no testimony offered to indicate that Brumfield had any motive to testify falsely.  Therefore, the hearsay evidence was not crucial to the matter in the context of the trial as a whole, and the strength of the state's case would not have been significantly undermined had the hearsay testimony been excluded. Consequently, this Court finds that the hearsay testimony was harmless under *Cupit*, and thus, Petitioner's claim for *habeas* relief is denied.

### 7. New Evidence - Affidavit

Petitioner claims that he is entitled to relief because of an "affidavit" in which Roy Brumfield recants his trial testimony.  However, Petitioner does not support his claim with any federal case law or authority.  Indeed, Petitioner relies solely on state cases and statutes to argue that relief is available based on the "affidavit."

The state correctly notes that the "affidavit" is neither notarized nor dated, and that there is no indication that the statement was made under oath.  State Rec., Vol. 3. Application for Post Conviction Relief, Exhibit B.  Additionally, the state observes that the "affidavit" misidentifies the affiant, Roy Brumfield, as female.  Furthermore, the Fifth Circuit "views recanting affidavits with extreme suspicion."  *Komolafe v. Quarterman*, 246 Fed.Appx. 270, 272 (5th Cir. 2007) (citing *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996)).  In light of the deficiencies in the "affidavit," this Court does not find the "affidavit" to be credible.

24

Finally, as stated earlier, a federal court cannot review a state court's interpretation of its own law in a *habeas corpus* proceeding. *Haygood v. Quarterman*, 239 Fed.Appx. 39, 42 (5th Cir. 2007). In this case, Petitioner presented the "affidavit" and state based grounds for relief to the state courts during his post-conviction proceedings. Therefore, this Court cannot review the state courts' decision to deny relief on this claim. Accordingly, Petitioner's claim for relief is denied on this ground.

### 8. Jury Instructions

Petitioner argues that the trial court improperly instructed the jury by failing to state that reasonable doubt could be found from "a lack of evidence." Additionally, Petitioner claims that the instruction on circumstantial evidence was flawed.

Generally, the submission of improper jury instructions in a state criminal trial is not a basis for federal habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 71 (1991); *see also, Weeks v. Scott*, 55 F.3d 1059, 1065 (5th Cir. 1995). Federal habeas relief is warranted only where the petitioner demonstrates that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Weeks*, 55 F.3d at 1065 (quoting *Estelle*, 502 U.S. at 72). When reviewing whether an allegedly erroneous jury instruction violated due process, the trial court's instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Thus, this Court must inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990). Furthermore, any errors are subject to harmless-error analysis under *Brecht*. *Galvan v. Cockrell*, 293 F.3d 760, 765 (5th Cir. 2002). In a *habeas* proceeding, *Brecht* holds that a constitutional error is not

25

harmless if it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

In this case, there is no factual basis for Petitioner's claim that the trial judge improperly instructed the jury on reasonable doubt for failing to note that reasonable doubt can arise from the lack of evidence.  Indeed, the record reflects that the judge stated, "[n]ow, in considering the evidence, you must give the defendant the benefit of every reasonable doubt arising out of the evidence or the lack of evidence."  State Rec. Vol. 4, Jury Instructions Transcript, p. 3.

Similarly, Petitioner claims that the instruction for circumstantial evidence was flawed for failing to distinguish the burdens of proof between "direct" and "circumstantial" evidence. However, the record shows that the judge defined both types of evidence:

> Evidence is either direct or circumstantial. Direct evidence is evidence which you believe proves a fact. Circumstantial evidence is evidence which you believe proves a fact and then, from that fact, you reasonably and logical infer that another fact exists. You cannot find a defendant guilty solely on circumstantial evidence unless that evidence, that circumstantial evidence excludes every reasonable hypothesis of innocence.

*Id.* at p. 5.  Furthermore, the judge stated, "if you are not satisfied beyond all reasonable doubt that the defendant has been properly and correctly identified as the person who committed the offense charged, it will be your duty to find this defendant not guilty."  *Id.* at 9.  In this case, Petitioner has failed to demonstrate that the jury instructions were erroneous.  Moreover, there is no evidence, even assuming that the instructions were in error, that the instructions so infected the entire trial that the resulting conviction violates due process.  Therefore, the Court cannot grant *habeas* relief on these claims.

### 9. Petitioner's Statements: Knowing and Voluntary?

Petitioner asserts that he was not "Mirandized" and that any statements he made should

have been suppressed by the trial court.  Petitioner argues that the state has the burden of proving

that a confession was not the result of fear, duress, intimidation, or promises.  Essentially,

Petitioner avers that the state failed its burden to prove the voluntariness of his custodial

statements at the suppression hearing.

After a review of the Motion to Suppress transcript, the Court notes that the Petitioner

made statements to the police on the night of the victim's murder, but that Petitioner was not

arrested at that time.  During the Motion to Suppress hearing, Detective Polito testified:

> [Prosecutor:] You did, in fact, make an arrest on Henry Weber, correct?
> [Polito:] Yes, we did.
> [Prosecutor:] Were his rights read to him?
> [Polito:] Yes.
> [Prosecutor:] Did he understand these rights?
> [Polito:] Yes.
> [Prosecutor:] Did he, in fact, sign a Waiver of Arrestee Rights form?
> [Polito:] No.
> [Prosecutor:] But he did understand his rights, correct?
> [Polito:] (no audible response)
> [Prosecutor:] Did he make any statements?
> [Polito:] No, he did not.
> [Prosecutor:] At any time during your investigation, did he make any statements whatsoever?
> [Polito:] He did the night of the murder when the COPS officers caught him.
> [Prosecutor:] Was he under arrest at the time?
> [Politio:] No.
> [Prosecutor:] Under investigation?
> [Polito:] Under investigation.
> [Prosecutor:] To your knowledge, after speaking with those officers, was he advised of his rights at that time?
> [Polito:] Yes, he was.
> [Prosecutor:] And he made a statement. Do you recall what the statement was?
> [Polito:] We were questioning him about the bullets and concerning his whereabouts that night.
> [Prosecutor:] Did he, in fact, state where he was?
> [Polito:] He stated that he was at his cousin's house. And later on, he was at his girlfriend's house.
> [Prosecutor:] At that point, was he arrested?
> [Polito:] No, he was not.
> [Prosecutor:] He was released?

[Polito:] Yes.

State Rec., Vol. 2, Transcript of Motion Hearing, September 15, 2000, p. 21-22.  In addition,

Detective Polito was cross-examined at the Motion to Suppress hearing about whether the police

administered *Miranda* warnings to Petitioner:

> [Petitioner's Attorney:] What rights was Mr. Weber allegedly informed of the
> night he made his statements?
> [Polito:] What rights?
> [Petitioner's Attorney:] Yes.
> [Polito:] He has the right to remain silent. Anything you say, can be used against
> you in court. You have a right to speak to an attorney, have an attorney present
> during consult. If you could not afford an attorney, the court will appoint one for
> you.
> [Petitioner's Attorney:] Were you present when he was informed of those rights?
> [Polito:] [inaudible response]
> [Petitioner's Attorney:] Did he sign a Waiver of Rights card at that time?
> [Polito:] No, he didn't.
> [Petitioner's Attorney:] Did you record statements he made at that time?
> [Polito:] No.
> [Petitioner's Attorney:] Was anybody else present when he allegedly made those
> statements?
> [Polito:] I don't recall.
> [Petitioner's Attorney:] Do you know exactly what those statements were?
> [Polito:] I remember what they were.
> [Petitioner's Attorney:] What exactly were the statements?
> [Polito:] Well, like I answered you question earlier, he stated he was at his
> girlfriend's house at the time of the murder. And prior to that, he said he was at
> his cousin's house.

State Rec., Vol. 2, Transcript of Motion Hearing, September 15, 2000, p. 27-28.

Petitioner is seeking habeas relief for statements that were made to police officers on the

night of the underlying murder when Petitioner was questioned, but not arrested.  Clearly, there

is a conflict regarding the state's administration of Petitioner's *Miranda* rights: Detective Polito

claims that the investigating officers *Mirandized* Petitioner before questioning him; Petitioner

claims that he was not *Mirandized*.

The Court notes, following the trial judge's denial of the motion to suppress Petitioner's

28

statements, the state admitted his statements into evidence at trial:

> [Prosecutor:] Did you in fact, interview [Petitioner] about the incidents of that night?
> [Polito:] Yes, I did. I first advised him of his Constitutional rights and I explained to him why he was in the office, talked to him about his box of ammunition that the officer's found, and his possibly involvement in murder.
> [Prosecutor:] Did he give you any explanations?
> [Polito:] Yes, he did.
> [Prosecutor:] What did he tell you?
> [Polito:] He said he had nothing to do with the murder and, in fact, he was at his girlfriend's house at 810 Governor's Street. Once I learned that, I sent two other detectives to the address to try to locate Mr. Weber's girlfriend to go over it good. The detective met with negative results. She was not there.
> [Prosecutor:] Throughout your investigation after he had told you where [sic] was supposed to be, did you ever find out or confirm that in any way?
> [Polito:] Yeah. He - -
> BY MR. HART: Objection your honor. Hearsay.
> BY THE COURT: Objection overruled.
> [Prosecutor:] Through your investigation, were you able to either refute what he said or confirm what he said?
> [Polito:] Yes.
> [Prosecutor:] Did you, in fact, get a chance to speak with Baretha (ph) Goodman?
> [Polito:] Yes.
> [Prosecutor:] Based on your investigation, did the story that Mr. Weber gave you, confirm what he said?
> [Polito:] Yes.
> BY MR. HART: Objection. Hearsay, your honor.
> BY THE COURT: Objection overruled.
> [Prosecutor:] Did he in any way explain anything else to you about his whereabouts that evening?
> [Polito:] He said that he had gotten a ride from his cousin, Mr. Anthony Laurel, to his girlfriend's house on Govenor's Street.
> [Prosecutor:] Was that ever confirm [sic] or refuted?
> [Polito:] Yes, it was.
> [Prosecutor:] Was it refuted?
> [Polito:] Yes.

State Rec., Vol. 2, Trial Transcript, November 15, 2000, p. 188-90. On direct review, the state appellate court determined that Petitioner was "in custody" on the night of the murder when he was questioned. *State v. Weber*, 834 So.2d 540, 550 (La.App. 4 Cir. 2002) (stating, "[t]he record reflects that while the defendant was in custody on the night of the murder he was questioned

regarding his whereabouts that evening, and he related that he was with his girlfriend.").[8]  The

appellate court found no reason to reverse the trial court's decision to deny the motion to

suppress, finding insufficient evidence to support Petitioner's claim regarding a failure to

administer *Miranda* warnings:

> At the motion to suppress, Detective Polito testified that the officers who initially
> detained the defendant advised him of his rights. On appeal defendant contends
> that he was not advised of his rights; however, defendant presented no testimony
> or evidence at the hearing to refute the testimony of Detective Polito.
> Accordingly, there is nothing to indicate the trial court erred in denying the
> motion to suppress the statement.

*State v. Weber*, 834 So.2d 540, 550 (La.App. 4 Cir. 2002).   However, the state courts failed to

determine whether Petitioner knowingly and voluntarily waived his *Miranda* rights.

The Supreme Court has identified a two part test to determine whether a defendant has

knowingly, voluntarily, and intelligently waived his *Miranda* rights:

> First, the relinquishment of the right must have been voluntary in the sense that it
> was the product of a free and deliberate choice rather than intimidation, coercion,
> or deception. Second, the waiver must have been made with a full awareness of
> both the nature of the right being abandoned and the consequences of the decision
> to abandon it. Only if the "totality of the circumstances surrounding the
> interrogation" reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the Miranda rights have been
> waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  In *Soffar v. Cockrell*, 300 F.3d 588 (5th Cir.

2002), the Fifth Circuit investigated the two elements necessary for a "criminal suspect to validly

waive his *Miranda* rights." *Soffar*, 300 F.3d at 592. The court found that the defendant waived

his *Miranda* rights when the defendant "spontaneously volunteer[ed] incriminating statements

---

[8] Because Petitioner was deemed "in custody" and the police officers were asking (interrogating)
him about his whereabouts on the night of the murder, Petitioner was entitled to be advised of
his *Miranda* warnings.  *Miranda*, 384 U.S at 467.  Additionally, the Court notes that Miranda
applies to all statements, "whether inculpatory or exculpatory." *Id.* at 444.

about his involvement in the [murders]." *Id.*  Further, the court held that the defendant "himself instigated the discussion about the [murders] following his arrest for an unrelated crime. He was not threatened or coerced by the police, and continuously volunteered information about the crime during his interrogation." *Id.*  Similarly, in *U.S. v. Guanespen-Portillo*, 514 F.3d 393 (5th Cir. 2008), the Fifth Circuit determined that the defendant waived his *Miranda* rights when the government introduced a "*Miranda* warning form."[9]

In this matter, the state courts found that Petitioner was entitled to *Miranda* warnings because he was subjected to custodial interrogation.  *State v. Weber*, 834 So.2d 540, 550 (La.App. 4 Cir. 2002).  Assuming that the police properly administered *Miranda* warnings to Petitioner, the state courts failed to perform any analysis pursuant to *Moran v. Burbine* to determine the voluntariness of Petitioner's statements.

The Court notes that "[a] federal court entertaining a collateral challenge to the voluntariness of a confession is obliged to afford a presumption of correctness to state court findings of fact if fairly supported in the record, but is authorized to exercise *de novo* review over the ultimate conclusion of whether, under the totality of the circumstances, the confession was "voluntary." *Carter v. Johnson*, 131 F.3d 452, 461-62 (5th Cir. 1997).  In addition, the voluntariness of a confession requires the court to consider the "totality of all the surrounding circumstances - both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973).  Also, the Supreme Court has held that the admission of an involuntary statement is a "trial error" and subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).  Under this analysis, to grant federal *habeas*

---

[9] Yet, in *Guanespen-Portillo*, the court held that the "evidence as a whole did not clearly raise a question before the judge of the voluntariness of [the defendant's] waiver or confession." *Guanespen-Portillo*, 514 F.3d at 405.

relief, the trial error must have a substantial and injurious effect or influence in determining the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Therefore, even if this Court were to find that Petitioner was not advised of his *Miranda* rights, the Court would still have to consider whether the admission of his statements was harmless in determining the verdict. *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003).

As noted above, there was substantial evidence to support a second degree murder conviction. Again, the Court notes that Petitioner was apprehended shortly after the incident in possession of a box of bullets with the same caliber as those used to kill the victim. In addition, Roy Brumfield, an eye-witness, testified that Petitioner shot the victim. State Rec., Vol. 2, Trial Transcript, p. 151. In light of the overwhelming evidence of Petitioner's guilt, the Court is not convinced that Petitioner's statement offering an alibi, in combination with the state's effort to undermine the alibi, had a substantial effect or influence in determining the verdict. Accordingly, the Court finds that the introduction of Petitioner's statements regarding his whereabouts on the night of the murder was harmless. Because the statements were harmless, there is no need to determine whether the state administered *Miranda* warnings, or the voluntariness of Petitioner's statements.

### 10. Trial Court's Denial of Motion to Suppress Photo Lineup

Petitioner claims that the *Manson v. Brathwaite* factors for determining the reliability of identifications were not satisfied in this case. In addition, Petitioner asserts that Detective Polito identified Petitioner as a suspect to the identifying witnesses before the photographic lineups.

As an initial matter, Petitioner mischaracterizes Detective Polito's testimony during the motion to suppress hearing. In contrast to Petitioner's assertion, Detective Polito did not testify that he suggested to the witnesses that Petitioner was a suspect. On cross-examination at the

32

hearing, Petitioner's attorney elicited the following statements:

> [Petitioner's Attorney:] Did you identify Mr. Weber as a suspect before you showed Ms. Walker the photograph?
> [Polito:] Yes.
> [Petitioner's Attorney:] Did you identify Mr. Weber as a suspect before you showed Mr. Brumfield the photograph?
> [Polito:] Yes.
> [Petitioner's Attorney:] So Ms. Walker knew she was supposed to pick out the photograph of Mr. Weber?
> [Polito:] No.
> [Petitioner's Attorney:] But, she knew the suspect was Mr. Weber?
> [Polito:] I don't know whether she did or not.
> [Petitioner's Attorney:] But, didn't you just say you informed her that the suspect was Mr. Weber?
> [Polito:] No I didn't.

State Rec., Vol. 2, Transcript of Motion Hearing, p. 15. Based on the testimony elicited from Polito at trial, it is clear that Polito believed Petitioner was a suspect at the time of the photographic lineup. However, it is unclear that Polito communicated his suspicions to the witnesses.

Furthermore, when identifications at trial follow "a pretrial photographic identification, the conviction will only be set aside if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *Cooks v. Johnson*, 265 F.3d 1060, 2001 WL 872899, at *7 (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). The Court notes that "[i]t is the likelihood of misidentification that violates the defendant's right to due process." *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). The concern over misidentification has resulted in a two part test: first, was the photo lineup impermissibly suggestive; and second, did the photographic array create a substantial likelihood of irreparable misidentification based on the totality of the circumstances. *Id.* In addition, the *Brathwaite* factors for assessing the reliability of an identification are: "(1) the

opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree

of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of

certainty demonstrated by the witness; and, (5) the length of time between the crime and the

confrontation." *Brathwaite*, 432 U.S. at 114.

In this matter, an objective reading of the transcript demonstrates that Detective Polito

had personally identified Petitioner as a suspect prior to conducting the photographic lineup with

the witnesses, but that he did not communicate his opinion to the witnesses prior to the

photographic identifications.  In addition, the Court agrees with the Louisiana Appellate Court:

"the record reflects that both Roy Brumfield and Jane Walker were well acquainted with the

defendant prior to the shooting which substantially diminishes the possibility of

misidentification." *State v. Weber*, 834 So.2d 540, 551 (La.App. 4 Cir. 2002).  After a review of

the *Brathwaite* factors, the Court finds that there was not a substantial likelihood of

misidentification.  Therefore, the court does not find evidence of an impermissibly suggestive

pre-trial photographic identification.

**11. Witness' Heroin Use**

Petitioner claims that the trial court improperly prohibited the defense from impeaching

Roy Brumfield based on Brumfield's drug use prior to the incident.  Petitioner asserts that the

trial court's limitation of cross-examination violated his Sixth Amendment rights to confront his

accuser.  The state appellate court addressed this issue, stating:

> The record reflects that [Brumfield] admitted being under the direct and
> immediate influence of heroin at the time he witnessed the murder. The witness
> openly testified that he had used heroin intravenously only moments before the
> shooting. Furthermore, Brumfield essentially admitted to being a heroin addict
> when he related that he admitted himself to Charity Hospital to be treated for
> substance abuse.

34

*State v. Weber*, 834 So.2d 540, 551 (La.App. 4 Cir. 2002).

On cross-examination at trial, Petitioner's attorney specifically asked Brumfield about his

heroin use prior to the murder:

> [Petitioner's Attorney:] Mr. Brumfield, you did speak with detectives on the night
> when this incident occurred, right?
> [Brumfield:] Yes.
> [Petitioner's Attorney:] And you told them you didn't witness the shootings when
> you first spoke with them; isn't that correct?
> [Brumfield:] That's correct.
> [Petitioner's Attorney:] Did you also tell Detective Polito what you were doing
> that evening?
> [Brumfield:] Yes, sir.
> [Petitioner's Attorney:] Did you tell them that shortly before ten, you were with
> Kenneth Gardner, Lorenzo Harvey, and Jim Walker?
> [Brumfield:] Yes, sir.
> [Petitioner's Attorney:] At that right about the time [sic], Kenneth Gardner left?
> [Brumfield:] Yes, sir.
> [Petitioner's Attorney:] And when you took the drugs, who was present?
> [Brumfield:] Excuse me?
> [Petitioner's Attorney:] When you took the heroin that night, who was present?
> Who was there?
> [Brumfield:] Lorenzo was there (IA).
>
> . . . .
>
> [Petitioner's Attorney:] Did you tell Detective Polito that you, Jim, and Lorenzo
> went into the abandoned building and did drugs together?
> [Brumfield:] Yes, sir.
>
> . . . .
>
> [Petitioner's Attorney:] Why did you finish doing your heroin before Lorenzo?
> [Brumfield:] I think because I started earlier.
> [Petitioner's Attorney:] Oh, so, you all were sharing the same needle?
> [Brumfield:] No.
> [Petitioner's Attorney:] You were just done first?
> [Brumfield:] Yeah.
>
> . . . .
>
> [Petitioner's Attorney:] Approximately how long before you finished using the
> heroin did Jim finish snorting; did you notice?

35

> [Brumfield:] Uhn-uhn (negative response).
> [Petitioner's Attorney:] Was it a couple of minutes?
> [Brumfield:] About ten, fifteen minutes.
> [Petitioner's Attorney:] In the ten or fifteen minutes between the time Jim finished snorting and you finished shooting, you and Lorenzo finished shooting, correct?
> [Brumfield:] Uh-huh (positive response).
> [Petitioner's Attorney:] Yet, it was your testimony a few minutes ago that you went outside shortly after Jim and you're only a few feet behind him; isn't that correct?
> [Brumfield:] I said he was at the front of the building (IA).
> [Petitioner's Attorney:] Which way were you looking when you heard the first shots?
> [Brumfield:] I was looking towards Jim when I heard the first shot.
> [Petitioner's Attorney:] So why would you need to turn around when you heard the second gunshot?
> [Brumfield:] Because I (IA).
> [Petitioner's Attorney:] But you didn't?
> [Brumfield:] I didn't because I heard something, some noise.

State Rec., Vol. 2, Trial Transcript, p. 159-63.  Therefore, Brumfield was in fact cross-examined on his drug use and the jury was aware that his perception of the incident may have been impaired.  Accordingly, there is no basis for Petitioner's assertion that the trial court erred in preventing cross-examination regarding Brumfield's drug use.

### 12. Limited Evidence Regarding Police Tampering

Petitioner's final claim for relief is that the trial court violated his due process rights by prohibiting the defense from presenting evidence that the police tampered or planted evidence. Petitioner claims that the defense was not allowed to introduce evidence that Petitioner was not holding a sock containing a box of bullets at the time the investigating officers apprehended him. The state appellate court addressed this issue, ruling:

> Defendant contends the trial court erred in granting the state's motion in limine to prevent the defense from presenting evidence that the police tampered with or planted evidence. Defendant alleges that he was prevented from introducing evidence that the defendant was not holding the sock containing the bullets and that it was not found anywhere near his person. The record reflects that defense

36

> counsel cross-examined Officers Young, Johnson and Palmer. Defense counsel
> also cross-examined the crime scene technician who recovered the evidence
> regarding the recovery of the sock and the alleged discrepancy between the report
> and the officers' testimony. Defendant does not suggest here, nor did counsel
> offer any indication when the motion was heard, as to what evidence he sought to
> introduce was excluded by virtue of the motion. Absent some indication as to
> what evidence, if any, that the defense was precluded from introducing, there is
> nothing for this court to review.

*State v. Weber*, 834 So.2d 540, 551-52 (La.App. 4 Cir. 2002).  Following an exhaustive review

of the pre-trial motion transcript, the Court notes that the state's motion in limine to preclude

discussion of tampering was granted only in a limited fashion by the trial court.  During the

motion hearing, Petitioner's counsel confirmed with the trial court that he could question the

investigating officers about evidence that was found at the scene of the crime:

> [Petitioner's Counsel:] As long as we are not talking about the other evidence that
> was collected on the scene at the time, the casings, the clothing, the bike, the
> bullets, all of that, how it was found and when it was found, where it was found.
> [By the Court:] It would come in as it normally would, any questions about that.
> [Petitioner's Counsel:] And inconsistencies?
> [By the Court:] And inconsistencies that we talked about to the alleged bullet
> casings. That motion is granted in it's [sic] entirety. What else?
> [Petitioner's Counsel:] Thank you, your Honor.

State Rec., Vol. 2, Hearing Transcript, p. 5.  Thus, Petitioner's counsel earned the right to

question the state's witnesses with regard to the bullets recovered from the crime scene.

Accordingly, this Court agrees with the state appellate court that there is no indication that

Petitioner was precluded from introducing evidence about the box of bullets by the state's

motion in limine.

Furthermore, Petitioner has not provided the Court with any evidence to support his

claims that the box of bullets had been tampered with or planted at the scene of a crime.

Petitioner's claim is not sufficiently supported, and thus, appears to be conjecture.  A federal

court "cannot consider a habeas petitioner's bald assertions on a critical issue" when the claim is

unsupported by the record.  *Ross v. Estelle*, 694 F.2d 1008, 1011-12 (5th Cir.1983) (noting, "[a]bsent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro se petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value.").  Accordingly, the Court cannot grant relief on this ground.

## V. CONCLUSION

Having considered the complaint, the record, and the applicable law, it is determined that Petitioner's claims are without merit.  Accordingly, Petitioner's claims are without merit and it is **ORDERED** that the petition of Henry Weber be **DENIED WITH PREJUDICE**.  Judgment will be entered accordingly.

New Orleans, Louisiana this 20th day of August, 2008.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE